IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DON PHILLIP GUNDERSEN, <br> Plaintiff, <br> v. <br> EQUIFAX INFORMATION SERVICES, LLC; EXPERIAN INFORMATION SOLUTIONS, INC.; TRANS UNION, LLC; FAIR ISAAC CORPORATION; and AMERICAN EXPRESS, N.A., <br> Defendants. | MEMORANDUM DECISION AND ORDER <br><br> Case No. 1:22-CV-52 <br><br> Howard C. Nielson, Jr. <br> United States District Judge <br><br> FOR PUBLICATION |

Plaintiff Don Phillip Gundersen sues Defendant Fair Isaac Corporation, alleging violations of the Fair Credit Reporting Act. The court previously dismissed one of Mr. Gundersen's three claims against it, and FICO now moves for summary judgment on the two remaining claims. The court grants FICO's motion.

I.

After discovering that Experian, Equifax, and TransUnion were reporting that he was deceased, Mr. Gundersen—very much alive—sued these national credit bureaus, as well as FICO and American Express.[1] Only Mr. Gundersen's claims against FICO are currently before the court.

---

[1] Apparently, the trouble began when Mr. Gundersen's mother answered a call from an American Express representative regarding an outstanding debt. *See* Dkt. No. 2 ¶ 33. When the representative asked to speak with "Mr. Don Gundersen," the mother responded that he had died five years earlier—evidently assuming that the representative was asking to speak with her late husband, Don *Keller* Gundersen, rather than her son, Don *Phillip* Gundersen. *Id.* ¶ 33–36.

Mr. Gundersen brought three claims against FICO, alleging violations of 15 U.S.C. §§ 1681e(b), 1681i, and 1681s-2(b), respectively. *See* Dkt. No. 2. FICO moved to dismiss all three claims. *See* Dkt. No. 38. The court dismissed Mr. Gundersen's third claim because Mr. Gundersen had failed adequately to allege that FICO was a "furnisher" within the meaning of the FCRA, as required for liability under Section 1681s-2(b). *See* Dkt. No. 73.

Mr. Gundersen's two remaining claims are based on statutes that apply to FICO only if it falls within the FCRA's definition of a "consumer reporting agency." As the court explained at the hearing on the motion to dismiss, whether FICO falls within this definition turns on its role in generating the FICO scores used by the national credit bureaus. Because the court could not resolve that narrow factual question on a motion to dismiss, the court converted FICO's motion to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d). *See id.* After the parties concluded targeted discovery on this question, *see* Dkt. Nos. 73, 76–80, FICO renewed its motion for summary judgment, *see* Dkt. No. 82.

## II.

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it "might affect the outcome of the suit under the governing law"; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### III.

For purposes of the FCRA,

> [t]he term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f). Here, FICO has provided undisputed evidence that its role in generating the FICO scores offered in response to credit inquiries by the national credit bureaus (which FICO refers to as the consumer reporting agencies or CRAs) is limited to providing software to the bureaus and maintaining that software through software updates. Ethan Dornhelm, FICO Vice President for Scores and Predictive Analytics, declared that "[b]eyond licensing its scoring software tools to each CRA, FICO does not have any role in the generation of any individual consumer's FICO Score. When an End User requests a FICO score from a CRA, FICO is neither aware nor involved in the transaction." Dkt. No. 82-2 ¶ 8.[2]

Mr. Gundersen argues that FICO nevertheless meets the definition of a consumer reporting agency because it "retains ownership at all times" of the algorithm embedded in the software that the national credit bureaus use to generate FICO scores. Dkt. No. 85 at 18. Mr. Gundersen contends that "FICO's *algorithm*, and therefore FICO, assembles *and* evaluates consumer credit information." Dkt. No. 85 at 14 (first emphasis added).

But under the FCRA, a consumer reporting agency is defined as "*any person*" who, *inter alia*, "regularly engages in whole or in part in the practice of assembling or evaluating consumer

---

[2] To be sure, FICO's licensing agreements with the national credit bureaus generally entitle it to a royalty each time a bureau distributes a FICO score in response to a credit inquiry. *See* Dkt. No. 82-2 ¶ 12. But that payment arrangement does not change the fact that besides licensing its software to the national credit bureaus, FICO plays no role in generating the scores.

credit information or other information on consumers." 15 U.S.C. § 1681a(f) (emphasis added). A "person," in turn, is defined as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." *Id*. § 1681a(b). Although this definition of "person" is expansive, it cannot plausibly be read to include a proprietary algorithm. In addition, to meet the definition of a consumer reporting agency, a "person" must not only assemble or evaluate consumer information but must also do so "*for the purpose* of furnishing consumer reports to third parties." *Id*. § 1681a(f) (emphasis added). But an inanimate process like an algorithm is not an "actor capable of possessing specific intent." *Zabriskie v. Federal Nat'l Mortg. Ass'n*, 940 F.3d 1022, 1028 (9th Cir. 2019) (cleaned up). The plain statutory text thus compels the common-sense conclusion that FICO's *algorithm* is not a *person* who can assemble or evaluate consumer credit information *for the purpose* of furnishing consumer reports to third parties.

Mr. Gundersen also argues that *FICO itself* evaluates consumer credit information because "FICO, not the algorithm itself, nor the CRAs whose data the algorithm used . . . dictates and decides how to 'weigh' individual pieces of a consumer's credit information in order to produce a final 'evaluation' of that consumer's credit health—a FICO Credit Score." Dkt. No. 85 at 20; *see also id*. at 18–19 (emphasis in original) (arguing that FICO's "algorithm merely *implements and conducts itself in accord with FICO's pre-programmed instructions*").

But under FCRA, a "consumer" is defined as "an individual." 15 U.S.C. § 1681a(c). It follows that "consumer credit information" means information about specific consumers. Mr. Gundersen does not offer any evidence or serious argument that FICO assembles or evaluates any *specific* consumer's information for the purpose of generating a report on *that* consumer's creditworthiness. And the undisputed evidence establishes that "[w]hen developing or updating

4

FICO's software tools and algorithms, FICO personnel do not use or have access to any identifiable consumer credit information. FICO uses only depersonalized data that does not identify any particular consumer to develop and update its scoring software tools and algorithms." Dkt. No. 86-2 ¶ 6. The court has no difficulty concluding that using depersonalized data to determine which criteria to include in FICO's algorithm and how much weight to give those criteria "on a grand scale"—as Mr. Gundersen puts it—does not amount to evaluating credit or other information *relating to any individual consumer*. Dkt. No. 85 at 20.

In short, when a national credit bureau enters consumer credit information into software it has licensed from FICO and generates a FICO score, the national credit bureau—not FICO—is the person that assembles and evaluates consumer credit information. Indeed, FICO can no more reasonably be said to have produced a score generated by a national credit bureau using FICO's software than can Microsoft be said to have written briefs prepared by lawyers using Microsoft Word or to have performed calculations generated by accountants using Microsoft Excel. The court thus agrees with the Federal Trade Commission that "[a] seller of software to a company that uses the software product to process credit report information is not a CRA because it is not 'assembling or evaluating' any information." FTC, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of interpretations*, 29 (2011), https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.[3]

---

[3] This interpretation is contained in a report issued by the FTC shortly before responsibility for interpreting the FCRA shifted from the FTC to the Consumer Financial Protection Bureau and appears to reflect the FTC's position since at least 1997. *See id*. 101 n.54. The report summarized the interpretive positions developed by the FTC over the previous four decades and was prepared to assist the CFPB as it assumed interpretive responsibility for the FCRA. *See id*. at 2. The parties have not cited—and the court has not found—any indication that

To be sure, FICO also sells FICO scores and consumer reports directly to customers through its myFICO service. *See* Dkt. No. 86-2 ¶ 3. But Mr. Gundersen himself acknowledges that those scores and reports are created not by FICO but by the national credit bureaus. *See* Dkt. No. 85 at 14–15. As Mr. Dornhelm explained, "[f]or its myFICO customers, FICO may obtain an individual's consumer report or FICO Score *from a consumer reporting agency—Experian, Equifax, or TransUnion*—at the individual's direction and on the individual's behalf." Dkt. No. 86-2 ¶ 3 (emphasis added); *see also* Dkt. No. 85-2 at 14–15 (FICO's 2020 Form 10-K Report) ("We make available the 28 most widely used versions of the FICO Score *from the three major U.S. credit bureaus* through our myFICO service.") (emphasis added). Indeed, FICO has provided undisputed evidence that it "does not have access to the requisite consumer report information from which FICO Scores may be generated." Dkt. No. 82-2 ¶ 8. It is thus clear that FICO does not assemble and cannot evaluate consumer credit information, whether as part of its myFICO service or otherwise.

Further, FICO does not provide these scores and reports "for the purpose of furnishing consumer reports *to third parties*," as would be required for FICO to meet the definition of a counter reporting agency. Rather, FICO provides these scores and reports directly to consumers for personal use in understanding and monitoring their own credit scores and reports. *See* Dkt. No. 85-2 at 14–15. Indeed, the myFICO customer agreement expressly requires subscribers to

---

the CFPB has departed from the FTC's interpretation quoted above. Because the court independently reaches the same interpretation, it need not decide whether it should afford the FTC's interpretive guidance deference of any sort.

agree to use the scores and reports they receive from FICO "for [their] own personal educational and informational use and not for any other use." Dkt. No. 86-2 ¶ 4.[4]

The court concludes that "furnishing consumer reports to third parties" cannot reasonably be understood to include providing consumers their own credit scores and reports for personal use. After all, the phrase "*third* parties" naturally connotes someone other than the persons involved in assembling and evaluating consumer credit information and furnishing the consumer report, on the one hand, and the consumer who is the subject of the report, on the other hand. It follows, as the FTC has explained, that a person or entity "does not become a CRA by regularly giving a copy of the report, or otherwise disclosing it, to the consumer who is the subject of the report (or the consumer's representative), because it is not disclosing the information to a 'third party.'" *40 Years of the FCRA* at 31.[5] Other courts have reached the same conclusion. *See, e.g.*, *Wantz v. Experian Information Solutions*, 386 F.3d 829, 834–35 (7th Cir. 2004) (*abrogated on other grounds by Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 56 n.8 (2007)); *Sgouros v. Transunion Corp.*, 2016 WL 4398032, at *4 (N.D. Ill. Aug. 18, 2016); *Howard v. Blue Ridge Bank*, 2005 WL 1865418, at *2 (N.D. Cal. Aug. 1, 2005); *cf. Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1334–35 (11th Cir. 2015).

---

[4] Mr. Gundersen also cites a statement from a fifteen-year-old decision that FICO would "sell a FICO-score-and-credit-report bundle directly to lenders or consumers." *Fair Isaac Corp. v. Equifax Inc.*, 2008 WL 623120 at *6 (D. Minn. Mar. 4, 2008). Although FICO admits that it "did offer a service through which it acted on behalf of and at the direction of lenders, pursuant to contract, to pass along CRA-generated FICO Scores and credit reports to those lenders," Mr. Dornhelm explained that this "service was discontinued in 2018"—well before the events giving rise to this lawsuit. Dkt. No. 86-2 ¶ 7.

[5] This appears to have been the FTC's interpretive position since at least 1990. *See id*. at 101 n.58. Again, the court independently reaches the same interpretation.

For all of these reasons, the court concludes that FICO is not a consumer reporting agency under the FCRA.

In the alternative, Mr. Gundersen argues that FICO may be held liable on his claims as a "reseller." This argument fails at the outset because, under the FCRA, a "reseller" is defined as "*a consumer reporting agency*" that—

1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and

2) does not maintain a database of the assembled or merged information from which new consumer reports are produced.

15 U.S.C. § 1681a(u) (emphasis added). This statutory definition makes clear that FICO cannot be a "reseller" unless it is also a "consumer reporting agency." And for the reasons already explained, FICO is not a "consumer reporting agency" within the meaning of the FCRA.

\* \* \*

Because FICO is not a consumer reporting agency, Mr. Gundersen's remaining claims against it fail as a matter of law. The court accordingly **GRANTS** FICO's motion for summary judgment.

**IT IS SO ORDERED.**

DATED this 21st day of July, 2023.

Howard C. Nielson, Jr.
United States District Judge